IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AUNDREANETTA SPARKS, | ) | CASE NO.  1:20-CV-00444-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

Plaintiff Aundreanetta Sparks ("Plaintiff" or "Sparks") challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In May 2016, Sparks filed an application for POD, DIB, and SSI alleging a disability onset date of March 18, 2015 and claiming she was disabled due to depression, bipolar disorder, and mood disorder. (Transcript ("Tr.") at 16, 316.)  The applications were denied initially and upon reconsideration, and Sparks requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 16.)

On January 22, 2018, an ALJ held a hearing, during which Sparks, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

After the hearing, the ALJ determined additional medical and psychological examinations were necessary and proffered the reports/evaluations on September 7, 2018.  (*Id.*)  The ALJ also determined additional vocational expert testimony by way of interrogatories was necessary and proffered the vocational expert's responses on October 11, 2018.  (*Id.* at 16-17.)

On January 23, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 16-25.)  The ALJ' s decision became final on February 10, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On February 27, 2020, Sparks filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16-17.)  Sparks asserts the following assignments of error:

(1) The ALJ erred in failing to incorporate Plaintiff's need to elevate her legs in her residual functional capacity assessment;

(2) Substantial evidence does not support the ALJ's finding that the Plaintiff can perform a range of light work;

(3) New and material evidence warrants remand.

(Doc. No. 16 at 17-18, 22.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Sparks was born in March 1969 and was 48 years-old at the time of her administrative hearing (Tr. 23), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 23.)  She has no past relevant work.  (*Id.*)

**B.      Pre-Hearing Relevant Medical Evidence[2]**

On March 24, 2015, Sparks saw neurologist Dr. Naila Goenka for follow up.  (*Id.* at 753-54.) Sparks complained of pressure in her left leg, knees giving out, swelling in her hands, and tingling in her fingertips and toes.  (*Id.* at 754.)  Dr. Goenka noted a 2014 brain MRI was normal.  (*Id.*)  Sparks refused to undergo EMG testing as it would be uncomfortable.  (*Id.*)  On examination, Dr. Goenka found no pronator drift, symmetrical rapid finger movements, normal muscle tone and bulk, and no muscle weakness.  (*Id.* at 755.)

On March 31, 2015, Sparks was saw Dr. Thomas Anderson for follow up regarding her right knee pain.  (*Id.* at 751.)  Sparks reported "fairly significant pain" that she rated as ranging from a 5-8 out of 10. (*Id.*)  On examination, Dr. Anderson found no knee effusion, diffuse tenderness about the patella, and a "click" when stressing Sparks' medial collateral ligament but no particular tenderness.  (*Id.*)  Dr. Anderson also found Sparks was no longer tender when he stressed her ulnar collateral ligament.  (*Id.*) Sparks reported doing physical therapy as well as wearing an immobilizer.  (*Id.*)  Dr. Anderson ordered an MRI to evaluate the clicking sound.  (*Id.*)

On April 3, 2015, Sparks saw Josepha Schenkelberg, PT, for her fourth physical therapy appointment for right knee pain.  (*Id.* at 748.)  Sparks rated her pain as a 6/10 and described it was constant and throbbing.  (*Id.* at 749.)  Schenkelberg noted Sparks had been non-compliant with her home exercise program and was scheduled to have an MRI of her right knee on April 7, 2015.  (*Id.*)  On examination, Schenkelberg found Sparks unable to lift her right leg to transfer from sitting to supine, navigate stairs, or walk more than 50 feet without resting.  (*Id.*)  Sparks also demonstrated gait deviations before therapy but had a normal gait after physical therapy interventions.  (*Id.* at 749-50.)

On April 7, 2015, Sparks saw pulmonologist Dr. Punseet Garcia.  (*Id.* at 746.)  Dr. Garcia ordered

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

Sparks to continue use of her CPAP for treatment of her obstructive sleep apnea and encouraged her to lose weight.  (*Id.*)  Dr. Garcia noted Sparks was doing well and reported sleeping well and having more energy now that she had her CPAP machine.  (*Id.*)  While Sparks continued to report some "niggles" of chest pain, Dr. Garcia noted recent testing had all been normal.  (*Id.*)

An April 9, 2015 MRI of Sparks' right knee revealed a "low to intermediate grade sprain of the MCL fibers proximally" and an "approximately 1.7 cm lesion in the fibular head abutting the anterior cortex" consistent with an enchondroma.  (*Id.* at 906-07.)

On April 13, 2015, Sparks saw Raphaelle Woods, RN, at Murtis Taylor for pharmacological management of her bipolar II disorder.  (*Id.* at 1192.)  Woods noted Sparks walked independently.  (*Id.*)  Sparks reported her appetite was fair, and while sleep was "still an issue," she had recently received a CPAP machine and hoped her sleep would improve.  (*Id.* at 1193.)  Sparks told Woods she was still napping during the day but was trying to stop.  (*Id.*)  Sparks also reported obsessive compulsive behaviors. (*Id.*)  On examination, Woods found Sparks' affect appropriate, her speech clear and distinct, her mood irritable, her thought process/content logical, and her judgment and insight fair.  (*Id.* at 1194.)  Woods continued Sparks' medication of Zoloft and Abilify.  (*Id.*)

On May 8, 2015, PT Schenkelberg discharged Sparks from physical therapy as she failed to return after her fourth appointment and was non-compliant with her home exercise program.  (*Id.* at 744-45.)

On May 11, 2015, Sparks saw rheumatologist Dr. Elizabeth Ray for a consultation requested by Dr. Goenka.  (*Id.* at 741.)  Sparks complained of widespread pain, fatigue, memory and concentration problems, and a lack of physical activity, which Dr. Ray found fit an underlying diagnosis of fibromyalgia.  (*Id.*)  Dr. Ray determined Sparks fit the ACR criteria for fibromyalgia "with a widespread pain index of 13 and symptom severity score of 8."  (*Id.*)  Sparks reported being "very debilitated" by her disease, rarely leaving the house, and had "great difficulty" playing with her young son.  (*Id.* at 741-42.)

4

Dr. Ray referred Sparks to physical therapy and neuro pain, and prescribed Flexeril.  (*Id.* at 742.)  Since Sparks was "opposed to doing any 'land-based' therapy," Dr. Ray ordered water therapy.  (*Id.*)  However, Dr. Ray noted Sparks was "quite reluctant" about the water therapy.  (*Id.*)

On May 18, 2015, Sparks saw primary care physician Dr. Lili Lustig for follow up.  (*Id.* at 739.) Sparks reported she did not like to leave her home because the thought of climbing stairs made her knees hurt.  (*Id.*)  Dr. Lustig noted Sparks refused an EMG because of needles being used.  (*Id.*)  Sparks told Dr. Lustig the medication Dr. Ray prescribed "'knocked her out and basically put [her] to sleep'" and she was unsure if it helped.  (*Id.*)  Sparks complained of pain everywhere all the time and rated her pain as 6.5/10. (*Id.*)  Sparks reported her activities of daily living, including standing and walking, were beginning to be affected, and nothing made her pain better.  (*Id.*)  Dr. Lustig noted she had previously prescribed therapy and discussed water therapy and viscus-supplementation.  (*Id.*)  Sparks declined knee injections, so Dr. Lustig said they would start with physical therapy.  (*Id.*)  Sparks also complained of a headache that had lasted for the past two days.  (*Id.*)  On examination, Dr. Lustig found Sparks had no edema or tenderness. (*Id.* at 740.)  Dr. Lustig noted she observed Sparks walking from the room to the front, which "show[ed] a painful gait."  (*Id.*)

On June 1, 2015, Sparks saw Nurse Woods for follow up.  (*Id.* at 1197.)  Although Sparks complained of poor sleep and always feeling tired, she told Woods she did not wear her CPAP all the time.  (*Id.*)  Sparks also reported obsessive compulsive symptoms, feeling panicked when driving in cars after a March 2014 car accident, and feeling very anxious.  (*Id.*)  Sparks told Woods she was having a hard time adjusting to her children being out of school and had not been getting her daily afternoon nap.  (*Id.*) On examination, Woods found Sparks' affect appropriate, her speech clear and distinct, her mood irritable, her thought process/content coherent, and her judgment and insight fair.  (*Id.*)

The next day, Sparks saw psychiatrist Dr. Daniel Schweid at Murtis Taylor for pharmacological management.  (*Id.* at 1200.)  Sparks complained of agitation, obsessive compulsive symptoms, pacing floors, anxiety in cars, avoidance, and staying home.  (*Id.*)  Sparks told Dr. Schweid her appetite and sleep were "OK" and she got along with her two children.  (*Id.*)  On examination, Dr. Schweid found Sparks had a constricted affect, clear and distinct speech, irritable mood, coherent thought processes/content, and fair insight and judgment.  (*Id.*)  Dr. Schweid continued Sparks' Zoloft and Abilify.  (*Id.*)

On June 30, 2015, Sparks saw Dr. Lustig for a gynecological examination.  (*Id.* at 734.)  Sparks complained of uncontrolled pain, morning stiffness that was worse when getting out of bed, and foot pain.  (*Id.*)  Sparks denied any depression.  (*Id.*)  Dr. Lustig referred Sparks to pain management and podiatry.  (*Id.* at 737.)

On July 20, 2015, Sparks returned to Dr. Schweid and complained of fatigue, aggravation, OCD checking behavior "'a certain amt. of times,'" "OK" appetite, fair sleep, and avoidance.  (*Id.* at 1208.)  Sparks told Dr. Schweid she stayed home, shopped "minimally," and socialized "reluctantly."  (*Id.*)  She got along with her two children at home.  (*Id.*)  On examination, Dr. Schweid found Sparks had a constricted affect, clear and distinct speech, irritable mood, coherent thought processes/content, and intact judgment and insight.  (*Id.*)

On July 23, 2015, Sparks went to the South Pointe Hospital emergency room for complaints of intermittent headaches, body pain, and weakness.  (*Id.* at 730.)  Sparks reported feeling weak and unsteady while walking and that she had been experiencing these symptoms for a while.  (*Id.*)  Sparks told providers her headache was not the same as her typical migraines.  (*Id.* at 731.)  Sparks denied neck pain, stiffness, leg swelling, and ambulation problems.  (*Id.*)  Treatment providers diagnosed Sparks with body aches and migraine without status migrainosus and treated her with Toradol, Benadryl, and Zofran, along with IV fluids.  (*Id.* at 732.)  Sparks reported "marked improvement in her headache, to near-full resolution."  (*Id.*)

Routine lab work was normal.  (*Id.*)  Treatment providers encouraged Sparks to follow up with a rheumatologist regarding "symptoms suggestive of fibromyalgia." (*Id.*)

On August 18, 2015, Sparks saw pain management specialist Dr. Benjamin Abraham for complaints of diffuse body pain, leg pain, and knee pain.  (*Id.* at 727.)  Sparks reported the pain began a year ago, described the pain as aching and constant, and rated the pain as an 8/10 in severity.  (*Id.*)  Sparks told Dr. Abraham the pain was exacerbated by standing for a long time, using stairs, and activities, and was not relieved with anything.  (*Id.*)  Sparks reported taking baclofen but was not on anything for pain. (*Id.*)  On examination, Dr. Abraham found tenderness to palpation of the lumbar paraspinal muscles and an antalgic gait.  (*Id.* at 730.)  Dr. Abraham diagnosed Sparks with myalgia and myositis and prescribed Lyrica.  (*Id.*)

On September 28, 2015, Sparks saw Dalibir Singh, PA, for follow up regarding pain management. (*Id.* at 722.)  Sparks complained of generalized body pain that she described as achy and rated as a 9/10. (*Id.*)  Sparks told Singh she could not tolerate gabapentin because of side effects.  (*Id.*)  However, Sparks reported her current medications were providing pain relief and had improved her activities of daily living. (*Id.*)  On examination, Singh found no pain to palpation over the cervical paraspinals muscles or "over the PSIS" but an antalgic gait.  (*Id.*)  Sparks' diagnoses included fibromyalgia, myalgia, and a vitamin D deficiency.  (*Id.* at 723.)  Singh prescribed slowly increasing Lyrica as Sparks could not tolerate gabapentin.  (*Id.*)

On October 4, 2015, Sparks went to the South Pointe Hospital Emergency Room for complaints of chest pain and a headache.  (*Id.* at 718-19.)  Sparks reported the chest pain started at 10 p.m. the night before, was exacerbated by taking deep breaths and laying down, and was somewhat relieved if she sat up and forward.  (*Id.* at 719.)  Sparks described the pain as sharp and continuous.  (*Id.*)  Sparks told treatment providers her headache was no different than ones she had before.  (*Id.*)  Sparks denied taking any

medication for the headache or chest pain but came to the emergency room since it was not improving. (*Id.*)  Sparks denied any shortness of breath.  (*Id.*)  A physical examination revealed tachycardia.  (*Id.* at 720.)  Sparks was diagnosed with atypical chest pain, tachycardia, non-intractable episodic headache, and pleuritic chest pain.  (*Id.*)  Sparks' EKG and lab work were normal, and a chest CT was negative for pulmonary embolism.  (*Id.* at 721.)  Although Toradol did not improve Sparks' pain, a dose of morphine reduced the pain from a 10 to an 8 and Sparks told providers she wished to go home.  (*Id.*)  Treatment providers discharged Sparks in stable condition.  (*Id.*)

From October 7 through October 12, 2015, Sparks received inpatient treatment at South Pointe Hospital for shortness of breath with a change in mental status, fatigue, and memory loss.  (*Id.* at 677-716.)  An EKG was normal, as was a brain CT.  (*Id.* at 680.)  A chest x-ray revealed left lower lobe atelectasis.  (*Id.*)  Sparks refused a lumbar puncture to rule out meningitis.  (*Id.* at 679.)  By October 9, Sparks was "significantly better"; she was "quite awake and interactive," had no complaints of a headache, denied chest pain, and was transferred out of the ICU.  (*Id.* at 698, 702.)  On October 10, Sparks again complained of chest pain and shortness of breath and said this had been happening for months now. (*Id.* at 704.)  She also complained of a headache.  (*Id.* at 705.)  On October 11, Sparks said she felt well and wanted to go home.  (*Id.* at 708.)  Early in the morning on October 12, Sparks refused a CPAP.  (*Id.* at 709.)  A cause for the altered mental status was not found, and Sparks was discharged in improved and stable condition with diagnoses of headache, altered mental status, chest pain, and bipolar disorder.  (*Id.* at 716.)

On October 19, 2015, Sparks saw Dr. Lustig for follow up after her hospitalization.  (*Id.* at 674.)  As Sparks reported she was still experiencing exertional shortness of breath and fatigue, Dr. Lustig referred her to pulmonology.  (*Id.* at 675.)  Dr. Lustig noted that Sparks' chest pain was atypical, and her

symptoms were inconsistent with cardiac ischemia as Sparks' work up was negative during her recent hospital stay. (*Id.*) Dr. Lustig thought the possible etiology of the chest pain could be anxiety. (*Id.*)

On November 5, 2015, Sparks saw pulmonologist Dr. Louis Lam for complaints of chest pain and shortness of breath with exertion that had been getting worse over the past year. (*Id.* at 670.) Sparks also reported her heart would beat fast sometimes and she had intermittent swelling of her hands and feet. (*Id.*) On examination, Dr. Lam found normal breath sounds, gait, and posture. (*Id.* at 671-72.) Dr. Lam determined Sparks' chest x-ray was normal, as was her pulmonary function test. (*Id.* at 672-73.) As Sparks never underwent any formal stress testing and a 2014 echocardiogram showed low normal ejection fraction and stage I diastolic dysfunction, Dr. Lam referred Sparks to cardiology for formal stress testing "to rule out unstable angina." (*Id.* at 673.) Dr. Lam noted Sparks' history was "concerning for cardiac ischemia." (*Id.*)

On November 24, 2015, Sparks saw cardiologist Dr. Ajay Bhargava for follow up of her complaints of shortness of breath, fatigue, and to discuss the results of her testing. (*Id.* at 663.) Sparks reported "modest improvement" in her sleep apnea with her CPAP but had no improvement of her chest pain and shortness of breath. (*Id.*) Dr. Bhargava determined Sparks' testing had revealed no valvular abnormalities or ischemia, and that her fatigue, chest pain, and shortness of breath was likely "multifactorial" with obesity, fibromyalgia, and de-conditioning contributing to her symptoms. (*Id.* at 664.) At that point, Dr. Bhargava did not recommend any further cardiac testing and noted one of Sparks' medications could be contributing to her fatigue even though she was on a modest dose. (*Id.*)

On December 7, 2015, Sparks saw Dr. Lustig for follow up. (*Id.* at 660.) Sparks complained of pain in her hands and feet that she rated a 10/10. (*Id.*) Sparks reported her hands hurt even when she was not doing any labor, and while they felt tender, she did not have any numbing or burning. (*Id.*) While her fingers hurt, they did not feel cold to the touch. (*Id.*) Sparks told Dr. Lustig she had seen pain

management and they had done nothing for her. (*Id.*) Dr. Lustig noted a prescription had been sent to Sparks' pharmacy and told Sparks to recheck with pain management. (*Id.*) Sparks also complained of foot pain when first stepping down, even after rest. (*Id.*) Sparks described it as a burning sensation. (*Id.*) Dr. Lustig noted Sparks had not tried any shoe inserts but she was willing to do so. (*Id.*) On examination, Dr. Lustig found pain along the longitudinal plantar fascia and referred Sparks to podiatry for casting and shoe inserts. (*Id.* at 662.) Dr. Lustig also referred Sparks to occupational therapy for her hand pain. (*Id.*)

On January 12, 2016, Sparks saw PA Singh for follow up of her diffuse body pain and multiple joint pain. (*Id.* at 657.) Sparks described her pain as dull and stabbing and rated the pain as an 8/10. (*Id.*) Singh noted Lyrica was denied by Sparks' insurance and although Topamax was prescribed, Sparks never started it. (*Id.*) On examination, Singh found pain to palpation of the lumbar paraspinal muscles, as well as an antalgic gait. (*Id.* at 658.) Singh advised Sparks to start taking Topamax as prescribed, directed her to continue her Vitamin D, and referred her to rheumatology. (*Id.*)

On January 16, 2016, Sparks saw podiatrist Dr. Brian Novack for multiple foot complaints, including pain with rising and walking at the plantar aspects of the heels and arches of both feet for the past month, burning and cramping in the balls of both feet, and emerging hammer toes on both feet. (*Id.* at 655.) On examination, Dr. Novak found pain to palpation at the medial tubercle of the calcaneus bilaterally, contracted third and fourth toes underlapping the fourth toes bilaterally, and pain with dorsal to plantar squeeze of the third interspace bilaterally, as well as normal sensation. (*Id.* at 656.) Dr. Novack diagnosed Sparks with bilateral plantar fasciitis, hammertoe, and Morton's neuroma of third interspaces bilaterally. (*Id.*)

On February 2, 2016, Sparks saw Dr. Abraham for follow up regarding pain management of her fibromyalgia. (*Id.* at 652-53.) Sparks complained of aching pain that she rated as a 6/10 and described as worse when performing daily activities. (*Id.* at 653.) On examination, Dr. Abraham found Sparks had a

10

smooth gait.  (*Id.* at 654.)  Dr. Abraham noted Sparks was "[r]efractory to, or declined to try, multiple AEDs, SNRIs, nsaids, PT including the fda approved treatments for FMS."  (*Id.* at 654.)  Dr. Abraham noted Topamax caused nausea and vomiting so Sparks had stopped taking it.  (*Id.*)  Dr. Abraham ordered a structured program of Tai Chi as the next step.  (*Id.*)

On March 14, 2016, Sparks saw Nurse Woods for medication review.  (*Id.* at 1215.)  Sparks reported good appetite and fair sleep, although she complained her nights and days were mixed up.  (*Id.*)  After sleeping just a few hours, she woke up and got her children off to school and then slept from 8:00 a.m. to 2:00 p.m.  (*Id.*)  Sparks told Woods she had nothing to do and might start a program that was suggested to her.  (*Id.*)  On examination, Woods found Sparks had a fluid affect, clear and distinct speech, dysphoric mood, logical thought processes/content, and fair insight and judgment.  (*Id.*)

That same day, Sparks also saw Advanced Practice Nurse Shadina Terry at Murtis Taylor.  (*Id.* at 1217.)  Terry noted Sparks walked independently.  (*Id.*)  Sparks reported no job, increased sleep, some anxiety and repetitive behavior, secluding herself at times, disliking being around a lot of people, and trouble taking buses.  (*Id.* at 1219.)  However, Sparks reported enjoying being around family members and socializing with family and her ex-husband.  (*Id.*)  On examination, Terry found Sparks had a constricted affect, soft speech, concrete thought processes/content, and fair insight and judgment.  (*Id.*)

On April 11, 2016, Sparks saw APN Terry for follow up.  (*Id.* at 1223.)  Terry noted Sparks walked holding her side and complained of pain when walking because of her fibromyalgia.  (*Id.*)  Sparks reported she had not been taking Abilify because she did not like how it made her feel, that she had three bottles of medication, and would take the medication as needed.  (*Id.*)  Terry educated Sparks on medication compliance and symptom relief.  (*Id.*)  Sparks told Terry her anxiety was about the same and she continued to sleep most of the day.  (*Id.*)  However, Sparks was involved in her children's school

activities.  (*Id.*)  Sparks also reported a better relationship with her mother.  (*Id.*)  On examination, Terry found Sparks had an appropriate affect, soft speech, and euthymic mood.  (*Id.*)

On April 14, 2016, Sparks saw PA Singh for follow up.  (*Id.* at 643.)  Sparks described her pain as achy and throbbing and rated it at a 7/10.  (*Id.*)  Sparks reported getting pain relief from her medications and that her medications had improved her activities of daily living.  (*Id.*)  On examination, Singh found multiple tender points and an antalgic gait.  (*Id.* at 644.)  Singh prescribed Lyrica, ordered Sparks to follow up with Rheumatology as scheduled, and to return to the pain management clinic to see Dr. Abraham in eight weeks.  (*Id.*)

On May 12, 2016, Sparks saw Dr. Ray for follow up regarding of fibromyalgia.  (*Id.* at 639.)  Dr. Ray noted as follows:

> She was lost to follow up over the last year.  She is still having a lot of pain, feels that it is worsening.  Pain is in her elbows, fingers, neck, legs, knees.  "Stairs are a killer," she has trouble walking long distances.  She is not working and quit her job over a year ago (see above).
>
> She sleeps with a CPAP mask.  She uses it the whole time she is asleep and sleeps 8 hours of sleep at night.  She wakes up feeling refreshed but body is still sore – this is better than last year when she was having a great deal of fragmented unrefreshed sleep.
>
> She hasn't done any physical therapy and does not exercise at all.

(*Id.* at 640.)  Dr. Ray further noted Sparks had just started Lyrica.  (*Id.*)  Sparks also complained of tingling in her arms and fingers, fatigue to the point of exhaustion, and forgetfulness.  (*Id.*)  Dr. Ray again referred Sparks to the neuro pain rehab program, ordered her to continue with Lyrica, again ordered water therapy, and provided Sparks with some educational websites to help her decide which form of physical activity would work best for her.  (*Id.* at 642.)

On June 25, 2016, Ms. Sparks went to the South Ponte Hospital emergency room complaining of a headache that began four days before.  (*Id.* at 599.)  Sparks reported it was like headaches she had previously, except she was less light-sensitive than usual.  (*Id.*)  Sparks described the pain as throbbing

12

and complained of mild nausea as well.  (*Id.*)  Sparks reported she had a few episodes of diarrhea the past few days and had not taken her diabetes medicine the past few days because she thought that was what caused the diarrhea.  (*Id.*)  Bloodwork revealed abnormal glucose.  (*Id.* at 600.)  Treatment providers administered Toradol, Reglan, Benadryl, and IV fluids, which resolved Sparks' headache.  (*Id.* at 601.) Sparks' diagnosis consisted of a migraine without aura and with status migrainosus, non-intractable.  (*Id.*)

On July 13, 2016, Sparks saw Dr. Matthew Kampert to receive her Depo Provera injection.  (*Id.* at 596.)  Sparks also complained of a headache for the past two days.  (*Id.*)  Sparks described the headache as mild with tight pressure, and reported dizziness, nausea, and sensitivity to light and noise.  (*Id.*)  Sparks told Dr. Kampert when she gets these headaches, she feels a lot of tightness in her neck and shoulders. (*Id.*)  Sparks reported quitting drinking caffeinated soda in the past month and having new glasses.  (*Id.*) Sparks' diagnoses included tension headache, controlled Type 2 diabetes mellitus without complications, and essential hypertension that was under good control.  (*Id.* at 598.)

On July 29, 2016, Sparks saw APN Terry for symptom management.  (*Id.* at 1226.)  Sparks reported she was better and was up more during the day, sleeping less and not taking naps.  (*Id.*)  Sparks told Terry her anxiety was less, she was less irritable, and she denied depression, hallucinations, paranoia, and homicidal ideation.  (*Id.*)  Sparks reported some anxiety around people and riding elevators.  (*Id.*) Terry noted Sparks was smiling and made excellent eye contact.  (*Id.*)  On examination, Terry found Sparks' affect bright, speech clear and distinct, mood euthymic, thought processes/content logical, and paranoid delusions.  (*Id.*)

On August 3, 2016, Sparks saw Dr. Paul Saluan for complaints of pain in both knees.  (*Id.* at 592, 594.)  Dr. Saluan noted Sparks had had bilateral anterior knee pain for a while that had not responded to time.  (*Id.* at 594.)  Her knees bothered her when taking the stairs and doing squats but improved with rest.  (*Id.*)  On examination, Dr. Saluan found no tenderness to palpation throughout the medial lateral aspects

13

of the knees, full extension and flexion to 90 degrees without any difficulty, tenderness to palpation throughout the patellar ligament, bilateral tenderness, and no swelling.  (*Id.*)  X-rays of the knees revealed no bony abnormalities, and the fibular head enchondroma on the right remained unchanged.  (*Id.* at 594, 602.)  Dr. Saluan diagnosed bilateral patellar tendinitis and prescribed ice, anti-inflammatories, avoidance of activities, physical therapy, and Vimovo and Pennsaid as needed.  (*Id.* at 594.)

On August 18, 2016, Sparks saw Jessica Fulton, PT, for a physical therapy evaluation.  (*Id.* at 589.)  Sparks reported popping and grinding in her knees and told Fuller nothing helped her pain.  (*Id.* at 590.)  Sparks told Fuller she had physical therapy before, but the pain returned.  (*Id.*)  Sparks also complained of pain in her hips, back, and ankles.  (*Id.*)  Sparks described her knee pain as aching, throbbing, shooting, and constant, and rated her pain as a 7.5/10.  (*Id.*)  On examination, Fuller found lordosis and reduced lumbar posture, a varus deformity of the knee, pronated ankle/foot, limited knee flexion, swelling of the fat pad in the knee, bilateral tenderness of the patella tendons, lumbar range of motion limited by back pain, and normal range of motion in the hips without pain.  (*Id.*)  Fuller determined Sparks walked "with bilateral uncompensated [T]rendelenburg and internal collapse."  (*Id.*)  Fuller's assessment consisted of the following: "Patient presents with signs and symptoms of significant lower extremity weakness and pain. Patient demonstrates significant tightness in quadriceps and weakness throughout lower leg. Patient demonstrates rapid fatigue with initial exercises."  (*Id.* at 591.)

On September 2, 2016, Sparks arrived for her second physical therapy appointment, but refused to sign the consent form and left without being seen.  (*Id.* at 588.)

On September 9, 2016, Sparks saw Fulton for her second physical therapy appointment.  (*Id.* at 586.)  Sparks reported doing her exercises "sometimes."  (*Id.*)  Sparks reported having trouble getting in and out of cars, climbing stairs, and balancing, and told Fuller she was afraid of falling.  (*Id.*)  Sparks complained of bilateral knee pain that she rated as a 7/10 and described as constant.  (*Id.*)  On

14

examination, Sparks had a slow cadence and antalgic gait. (*Id.*) Fuller determined Sparks had "continued lower extremity weakness with minimal change since beginning therapy due to lack of compliance." (*Id.* at 587.)

On September 16, 2016, Sparks saw Dr. Novak for follow up of her bilateral plantar fasciitis. (*Id.* at 1944.) Dr. Novack noted: "The patient presents to the office complaining of a lot of pain involving the bottom of the heels and arches. She relates pain when standing and when walking. She was given night splints in January of this year however the patient did not follow up with me at that time. She states that she could not travel to the office at that time." (*Id.*) On examination, Dr. Novack found "pain to palpation at the medial tubercle of the calcaneus and along the medial and central bands of the plantar fascia bilaterally" and ordered Sparks to return in approximately six days to start physical therapy for her plantar fasciitis. (*Id.*)

Beginning September 22, 2016, Sparks received electrical stimulation of her feet as well as taping. (*Id.* at 1941-42.) On October 24, 2016, Dr. Novack noted Sparks had continued pain with weightbearing and walking in both feet but had not shown up to her last couple of physical therapy appointments. (*Id.* at 1929.) Indeed, Sparks failed to appear at four appointments. (*Id.* at 1931-32, 1935, 1938.)

On October 6, 2016, Sparks underwent surgery for bilateral hammertoes by Dr. Novack. (*Id.* at 1936-37.) On October 13, 2016, Dr. Novack determined the surgical sites were healing well with no sign of infection and the attitude of the affected digits had been corrected. (*Id.* at 1933.) Although Sparks complained of a little pain in her third toe, Dr. Novack told Sparks the pain should dissipate in a week or two. (*Id.*) During that same visit, Dr. Novack gave Sparks fitted orthotics and educated her on how to use them. (*Id.*)

On October 7, 2016, Sparks saw Emily Staples, D.O., for her three-month Depo-Provera shot and complaints of migraines and fibromyalgia. (*Id.* at 1394.) Sparks reported getting two to three migraines

per week and told Dr. Staples Motrin did not help and upset her stomach, and sometimes the migraines did not dissipate after sleeping. (*Id.*) Sparks told Dr. Staples she experienced nausea without vomiting and lightheadedness without blurry vision with these headaches. (*Id.*) Sparks reported getting no relief from Imitrex or Topomax. (*Id.* at 1395.) With respect to her fibromyalgia, Sparks told Dr. Staples her whole body was sore on a daily basis, she got tingling and tremors in her hands and arms, had pain in her whole body, was fatigued, and her Lyrica was not helping. (*Id.*) Dr. Staples noted Sparks had been referred to rheumatology and would be following up with them about her symptoms. (*Id.*) Dr. Staples referred Sparks to neurology for her headaches. (*Id.* at 1398.)

On October 20, 2016, Sparks returned to APN Terry for follow up. (*Id.* at 1319-20.) Sparks complained of poor sleep but told Terry she was better, although she had crying spells on and off over the past two days. (*Id.* at 1320.) Sparks also reported obsessive thoughts, irritability, and being up all night, getting only two to three hours of sleep. (*Id.*) While Sparks told Terry she was anxious, she denied any depression. (*Id.*) On examination, Terry found Sparks had a bright affect, soft speech, euthymic mood, logical thought processes/content, hallucinations of seeing someone in a white gown, and fair insight and judgment. (*Id.*) Terry added melatonin to Sparks' medications. (*Id.*)

On October 24, 2016, Sparks went to the South Pointe Hospital emergency room complaining of low back pain, abdominal pain, and urinary frequency. (*Id.* at 1410.) Sparks reported her left flank hurt and that it hurt to move. (*Id.*) Sparks described the pain as aching and rated it as a 7/10. (*Id.*) Sparks told providers the pain had begun three to four days earlier. (*Id.*) Sparks was diagnosed with pyelonephritis, also known as a kidney infection. (*Id.* at 1413, 1422.)

On November 29, 2016, Sparks saw urologist Dr. Sandip Vasavada for follow up from her emergency room treatment for a kidney infection. (*Id.* at 1493.) Sparks reported her left side pain had improved but not resolved. (*Id.*) Sparks also complained of constant nausea. (*Id.*) On examination, Dr.

16

Vasavada found a normal gait and a soft, non-tender, non-distended abdomen.  (*Id.* at 1494.)  Dr. Vasavada determined, "In absence of CT stranding and with no urine culture plus normal WBC count, unclear if patient had pyelonephritis at time of 10/24/2016 ED visit."  (*Id.* at 1495.)  Dr. Vasavada was unable to find an anatomic or functional cause for Sparks' left flank pain and advised investigating other possible causes.  (*Id.*)

On December 13, 2016, Sparks saw neurologist Dr. Robert Richardson for follow up.  (*Id.* at 1950.)  Sparks complained of headaches and tingling of both arms, although mainly on the right.  (*Id.*)  On examination, Dr. Richardson found normal sensation other than reduced pin sensation in both middle fingers, diffusely brisk reflexes, no ataxia, "[s]ignificant tightness of the upper cervical paraspinal muscles bilaterally," and a normal gait.  (*Id.*)  Dr. Richardson noted hyperreflexia that was not present when he had examined her a few weeks ago and determined her symptoms "strongly suggest[ed] a subacute cervical myelopathy that was not present" at his last examination.  (*Id.*)  Dr. Richardson ordered a cervical MRI to rule out myelopathic process and cyclobenzaprine to treat Sparks' cerviocranial syndrome.  (*Id.*)

On January 7, 2017, Sparks went to the South Pointe Hospital emergency room for complaints of neck pain that radiated down her back and numbness and tingling in her fingers.  (*Id.* at 1503-04.)  Sparks reported this was a chronic issue but had been worse in the past few days.  (*Id.* at 1504.)  Sparks told treatment providers neurology wanted to do more tests but could not tell them what tests and why she had not gotten them done.  (*Id.*)  Sparks also complained of pain in her hands, arms, feet, and lower back, as well as a "'foggy headache'" on occasion.  (*Id.*)  A physical examination revealed tenderness of the spinous process, normal range of motion of the neck, tenderness and pain of the cervical back, normal range of motion of the cervical spine, pain in the lumbar spine, normal range of motion of the bilateral upper extremities, normal coordination, normal strength, and normal gait.  (*Id.* at 1506.)  A cervical x-ray revealed shortening of the cervical curvature and mild endplate degenerative changes.  (*Id.*)  Treatment

providers determined: "She has not discussed her worsening symptoms with her PCP or her neurologist and she has not followed up with neurology as referred. Patient has no evidence of acute cervical injury, no rigidity or photophobia, or fever to indicate meningitis." (*Id.* at 1507.) Sparks was to use pain medication as needed over the weekend and call her primary care physician on Monday to discuss treatment options. (*Id.*) Treatment providers also referred Sparks to pain management. (*Id.*) Sparks' diagnoses consisted of chronic neck pain, cervical radicular pain, and numbness of the fingers. (*Id.*)

On January 12, 2017, Sparks returned to the South Pointe Hospital emergency room with complaints of headache, neck stiffness, and dizziness. (*Id.* at 1523.) When treatment providers asked if she had seen a neurologist lately, Sparks stated "she was supposed to have followed up with Dr. Richardson" but had been unable to do so because they had not called her back. (*Id.*) Treatment notes reflect that Sparks suffered from chronic neck pain and her current symptoms were typical of this. (*Id.*) On examination, Sparks had muscular tenderness in her neck but not over the spinous process. (*Id.* at 1525.) Treatment providers found Sparks intact and nonfocal from a neurological standpoint and did not suspect more serious causes of her symptoms beyond her chronic migraines and neck pain at that time. (*Id.* at 1526.) Sparks received a migraine cocktail that improved her headache, although her neck pain persisted. (*Id.*) Sparks was then given a dose of Norflex, which helped as well. (*Id.*) Sparks' diagnoses consisted of chronic neck pain and a non-intractable headache. (*Id.*)

On January 17, 2017, Sparks returned to Dr. Richardson for follow up. (*Id.* at 1951.) Dr. Richardson noted he still had not been contacted by Sparks' insurance for approval of the cervical MRI, despite several calls by his staff. (*Id.*) On examination, Dr. Richardson found normal sensation other than reduced pin sensation in both middle fingers, diffusely brisk reflexes, no ataxia, "[s]ignificant tightness of the upper cervical paraspinal muscles bilaterally," and a normal gait. (*Id.*) Dr. Richardson's impression was cervicocranial syndrome with headache, noting Sparks had hyperreflexia and a spinal sensory level at

18

C7 that suggested myelopathy.  (*Id.*)  Dr. Richardson noted he would order methocarbamol and outpatient physical therapy to treat Sparks' cerviocranial syndrome.  (*Id.*)

On January 23, 2017, Sparks saw APN Terry for symptom management.  (*Id.* at 1550.)  Sparks reported poor sleep, but her mood was okay, and she had not had any crying spells.  (*Id.*)  Sparks also complained of constant fatigue.  (*Id.*)  Sparks told Terry she continued to pace floors, she compulsively checked her doors, windows, and stove, had obsessive thoughts regarding her property, and was irritable.  (*Id.*)  Although Sparks reported isolating herself, she also told Terry she took her children on outings.  (*Id.*)  While she was anxious, she denied depression.  (*Id.*)  On examination, Terry found Sparks had an appropriate affect, clear and distinct speech, euthymic mood, coherent thought processes/content, no hallucinations or delusions, and intact judgment and insight.  (*Id.*)  Terry discontinued Sparks' melatonin.  (*Id.* at 1551.)

On February 10, 2017, Sparks returned to rheumatologist Dr. Ray.  (*Id.* at 1856.)  Treatment notes reflect Sparks had not seen Dr. Ray since May 2016.  (*Id.*)  Dr. Ray noted Sparks had been referred to physical therapy and the neuro chronic pain program but had not followed through and still did not exercise.  (*Id.*)  Sparks complained of pain all over, occasional hand swelling, lots of numbness and tingling in her hands, and occasionally waking up feeling unrefreshed despite sleeping with a CPAP machine.  (*Id.*)  On examination, Dr. Ray found widespread tenderness to palpation of both articular and non-articular sites.  (*Id.* at 1860.)  Dr. Ray noted, "I've seen her in clinic twice before and she has not followed through with the prior recommendations of physical therapy and referral to neuro chronic pain rehab.  She says she is now desperate and she has agreed to this."  (*Id.* at 1861.)  Dr. Ray ordered certain tests related to diagnosing rheumatoid arthritis because Sparks was "particularly concerned about a diagnosis of RA," although Dr. Ray had a "very low suspicion" of RA and believed Sparks' pain was due

to her fibromyalgia.  (*Id.*)  Dr. Ray increased Sparks' Lyrica, referred her to physical therapy for water therapy, referred her to the neuro chronic pain rehab program, and prescribed Flexeril for sleep.  (*Id.*)

On March 17, 2017, Sparks returned to Dr. Richardson for follow up.  (*Id.* at 1952.)  Dr. Richardson noted Sparks was "[s]till on cyclobenzaprine as she never picked up methocarbamol."  (*Id.*)  Sparks report unchanged tingling of her hands and feet, as well as cervical discomfort.  (*Id.*)  On examination, Dr. Richardson found normal sensation other than reduced pin sensation in both middle fingers, diffusely brisk reflexes, no ataxia, "[s]ignificant tightness of the upper cervical paraspinal muscles bilaterally," and a normal gait.  (*Id.*)  Dr. Richardson noted his office was still trying to work with Sparks' insurance to approve a cervical MRI.  (*Id.*)  In the meantime, Dr. Richardson reordered methocarbamol and again recommended physical therapy.  (*Id.*)

On April 4, 2017, Sparks underwent an MRI of her cervical spine, which revealed mild multilevel degenerative changes with mild canal narrowing and mild flattening of the ventral contour of the cord. (*Id.* at 1791-92.)

On May 11, 2017, Sparks saw APN Terry for symptom management.  (*Id.* at 1545.)  Sparks continued to complain of poor sleep, but her mood was okay, and she denied any crying spells.  (*Id.*)  Sparks told Terry she went on outings with her sister, and while she was anxious, she denied any depression.  (*Id.*)  On examination, Terry found Sparks had an appropriate affect, clear and distinct speech, euthymic mood, logical thought processes/content, persecutory delusions, and fair judgment and insight. (*Id.*)

On June 5, 2017, June 19, 2017, and July 3, 2017, Ms. Sparks received bilateral ultrasound guided injections of the plantar fascia of the feet.  (*Id.* at 1920-1925.)  By July 3, 2017, Sparks reported 60-70% pain relief with injection therapy.  (*Id.* at 1920.)

On June 18, 2017, Sparks went to the South Pointe Hospital emergency room with complaints of right ear pain and burning abdominal pain for the past three days.  (*Id.* at 1588.)  Sparks described her ear pain as more in her right lower jaw and said it had been going on for a few weeks, with intermittent point tenderness.  (*Id.*)  Sparks described her abdominal pain as waxing and waning and reported she was afraid to eat anything as it made her very nauseous.  (*Id.*)  On examination, treatment providers found mild pain to palpation of the submandibular space on the right side, pain to palpation of the right upper quadrant of the abdomen, and positive Murphy's sign.  (*Id.* at 1590.)  While Sparks' abdominal symptoms were suggestive of possible cholecystitis, an ultrasound was normal, and her labs were not concerning.  (*Id.* at 1591.)   Sparks received a prescription for Bentyl and was instructed to follow up with her primary care physician regarding her abdominal pain.  (*Id.*)

On July 13, 2017, Sparks saw Dr. Novack complaining of a painful bunion on her right foot that got red, irritated, and swollen.  (*Id.* at 1917.)   On examination, Dr. Novack found a hallux valgus deformity on the right foot but no significant limitation of dorsiflexion and no pain to palpation dorsally over the joint.  (*Id.* at 1918.)  Sparks told Dr. Novack she was interested in surgery, and Dr. Novack explained the procedure and post-operative care.  (*Id.* at 1919.)  Sparks told Dr. Novack she wanted to think about it.  (*Id.*)

On July 19, 2017, Sparks saw certified nurse practitioner Mary Patterson for a chronic pain rehabilitation evaluation.  (*Id.* at 1573.)  Sparks complained of generalized pain and headaches, with a usual pain level of an 8/10, but her current pain level was a 10/10.   (*Id.*)  Patterson noted Sparks used a walker.  (*Id.*)  Sparks reported some benefit with using Lyrica.  (*Id.* at 1574.)  Patterson noted Sparks had not had any water therapy, although it was ordered, and that Sparks was unaware she had been referred to the fibromyalgia clinic.  (*Id.*)  Sparks reported spending 16+ hours a day reclining.  (*Id.*)  A physical examination revealed tenderness to palpation of her entire spine, limited range of motion in all planes

secondary to pain, an ability to squat and rise, an ability to walk on heels and toes, multiple joint pain, multiple fibromyalgia tender points in the upper and lower torso, reduced range of motion in all joints secondary to pain, and an antalgic gait with a wheeled walker.  (*Id.* at 1576.)  Patterson diagnosed Sparks with fibromyalgia, migraines, plantar fasciitis, depression, anxiety, bipolar disorder per history, and psychological factors affecting physical condition, rule out psychoses.  (*Id.*)  Patterson offered Sparks admission to the chronic pain rehabilitation program after completion of her podiatry work up and treatment.  (*Id.*)

On August 3, 2017, Sparks returned to Dr. Novack and told him she wished to proceed with surgical removal of the bunion on her right foot.  (*Id.* at 1914-16.)

On August 11, 2017, Sparks saw Dr. Ray for follow up.  (*Id.* at 1875.)  Dr. Ray noted Sparks had been accepted into the neuro chronic pain clinic and was waiting to have foot surgery before beginning the program.  (*Id.*)  Sparks was taking 150 mg of Lyrica and thought it was helping, although she was unsure. (*Id.* at 1875-76.)  Sparks reported continued soreness, especially in her hands, and complained of having difficulty writing because it bothered her.  (*Id.* at 1876.)  Sparks also complained of bothersome hand numbness.  (*Id.*)  On examination, Dr. Ray found a positive Phalen's maneuver of the hands, although numbness was there before doing the test.  (*Id.* at 1879.)  Dr. Ray also found widespread tenderness to palpation of both articular and non-articular sites.  (*Id.*)  Dr. Ray referred Sparks to pain psychology, encouraged use of wrist splints at night, and ordered EMG testing.  (*Id.* at 1880.)

On August 16, 2017, Sparks underwent a modified McBride bunionectomy to the right first metatarsal phalangeal joint.  (*Id.* at 1824-25.)  Follow up visits with Dr. Novack after surgery revealed a healing surgical wound, excellent bunion correction, and no complaints from Sparks, even though a little over a week after surgery Sparks admitted to walking without a surgical shoe on her foot and her bandage was dirty and displaced.  (*Id.* at 1905, 1909, 1911.)

On August 30, 2017, Sparks saw Dr. Richardson for follow up.  (*Id.* at 1953.)  Sparks reported the methocarbamol helped her cervical pain for up to several hours at a time.  (*Id.*)  A lumbar brace helped her lumbar pain.  (*Id.*)  Dr. Richardson noted Sparks' sensory examination was normal and improved, and Sparks had a normal gait.  (*Id.*)  Sparks continued to have significant tightness of the upper cervical paraspinal muscles bilaterally.  (*Id.*)  Dr. Richardson ordered Sparks to continue taking the methocarbamol and to follow up in six months or as needed.  (*Id.*)

On September 28, 2017, Sparks saw APN Terry for follow up.  (*Id.* at 1638.)  Sparks denied depression but complained of some right toe pain and poor sleep.  (*Id.*)  Sparks also reported anxiety when looking at straight lines and told Terry she placed her furniture in diagonal lines.  (*Id.*)  Terry added Trazodone to Sparks' medications and again educated Sparks on good sleep hygiene.  (*Id.*)  On examination, Terry found Sparks had an appropriate affect, clear and distinct speech, euthymic mood, coherent thought processes and content, no delusions, and fair judgment and insight.  (*Id.*)

That night, Sparks went to the South Pointe Hospital emergency room with complaints of weakness and dizziness.  (*Id.* at 1609.)  Sparks reported intermittent episodes of dizziness which lasted for a few seconds and resolved on their own.  (*Id.*)  Sparks also complained of some lightheadedness.  (*Id.*)  Bloodwork revealed a mildly decreased potassium level and mild hypoglycemia.  (*Id.* at 1612.)  Sparks received potassium and juice.  (*Id.*)  Sparks diagnoses consisted of general weakness, hypokalemia, lightheadedness, dizziness, and hypoglycemia.  (*Id.*)

On October 12, 2017, Sparks saw Dr. Novack for complaints of pain in the right heel and arch when rising and walking.  (*Id.* at 1905.)  Dr. Novack taped Sparks' foot and administered an injection.  (*Id.* at 1905-06.)

On October 24, 2017, Sparks saw APN Terry for follow up regarding her complaints of poor sleep.  (*Id.* at 1842.)  Sparks reported improvement since starting Trazodone.  (*Id.*)  Sparks also reported she was

23

less anxious and less tired, and her concentration had improved as well.  (*Id.*)  On examination, Terry found Sparks had an appropriate affect, soft speech, euthymic mood, logical thought processes/content, no delusions, and intact judgment and insight.  (*Id.*)

Sparks underwent repeat injections to her right foot on October 26, 2017 and November 13, 2017. (*Id.* at 1901-04.)  Sparks reported one-third pain relief from the injection she received on October 26, 2017.  (*Id.* at 1901.)

On January 12, 2018, Sparks saw Dr. Richardson for complaints of increasing difficulty in walking because of back pain for the past month.  (*Id.* at 1954.)  Sparks reported neither methocarbamol nor a soft lumbar brace was helpful for this lumbar pain.  (*Id.*)  On examination, Dr. Richardson found normal power, tone, and bulk, reduced pinprick sensation on the right dorsum of the foot and the medial and lateral right shin, no ataxia, normal gait, no major tightness of the cervical or lumbar paraspinals, and bilateral SI joint tenderness, worse on the left.  (*Id.*)  Dr. Richardson opined that her pain was likely referable to SI joint arthritis or bursitis.  (*Id.*)  Dr. Richardson noted Sparks' lumbar radiculopathy was stable.  (*Id.*)  Dr. Richardson prescribed a prednisone taper for the next few days, and if that was not helpful, thought Sparks may benefit from SI joint injections.  (*Id.*)  Dr. Richardson ordered Sparks to continue methocarbamol.  (*Id.*)

On December 30, 2017, Sparks went to the South Pointe Hospital emergency room for complaints of chest pain, fatigue, and flu-like symptoms.  (*Id.* at 2000.)  Treatment providers noted all labs were normal and that Sparks' chest pain had been present for the past year.  (*Id.* at 2002.)  Sparks was to follow up with her primary care physician and follow up with a cardiologist.  (*Id.*)

On January 24, 2018, Sparks saw cardiologist Chad Raymond, D.O., following her recent emergency room visit for complaints of chest pain and shortness of breath.  (*Id.* at 1979.)  Dr. Raymond noted Sparks described some symptoms that were consistent with stable angina, although Sparks also said

24

some symptoms occurred at rest.  (*Id.* at 1980.)  Dr. Raymond ordered stress testing and an echocardiogram of her heart, and noted Sparks needed an "aggressive weight loss strategy."  (*Id.*)  An EKG taken that day revealed a normal sinus rhythm and voltage criteria for left ventricular hypertrophy, while an x-ray taken that day revealed no acute cardiopulmonary process and no significant interval change since November 2015.  (*Id.* at 1981.)

On February 2, 2018, Sparks saw CNP Amy Firrell for follow up regarding her persistent right shoulder pain.  (*Id.* at 1991.)  Sparks reported it had not improved since November 2017.  (*Id.*)  Although a November 2017 x-ray was normal, Sparks rated her pain as greater than 10/10 with extension in all directions.  (*Id.*)  Sparks told Firrell Naproxen and ice did not work, and the prednisone taper for her lower back did not help her shoulder.  (*Id.*)  On examination, Firrell found normal range of motion, tenderness, no edema, increased pain with rotation of the right shoulder in all directions, and a normal gait.  (*Id.* at 1992.)  Firrell diagnosed Sparks with chronic right shoulder pain, hypertension, and Vitamin D deficiency. (*Id.* at 1993.)  Firrell referred Sparks to Orthopaedics and physical therapy for her shoulder pain and started her on delayed release diclofenac sodium.  (*Id.*)

## C.    Post-Hearing Evidence

On August 9, 2018, after her hearing before the ALJ, Sparks underwent a consultative physical examination by Dr. Dorothy Bradford at the ALJ's request.  (*Id.* at 2004-17.)  Manual muscle testing was normal, as was range of motion testing except for reduction in the dorsolumbar spine range of motion. (*Id.* at 2004-08.)  On examination, Dr. Bradford found Sparks moved slowly and stiffly but did not need assistance to get out of a chair or onto the exam table, had tenderness to light touch over her shoulders, low back, and thighs, no spinal tenderness, decreased range of motion of the thorax and back due to alleged pain, had a slow and stiff, but even and regular, gait, leaned on a "non obligatory cane," and had no limp, shuffle, or other gait disturbance.  (*Id.* at 2016-17.)  Dr. Bradford assessed Sparks as follows:

> Claimant has widespread allodynia.  She appeared depressed.  Anticipating pain, she moved slowly, keeping her body stiff.  She leaned on a non obligatory cane with a normal gait.  Strength, ROM and joint exams are normal.  Connective tissue disease markers (in the medical record) are negative.
>
> In my medical opinion she likely has depression and fibromyalgia.  She is not a fall risk.  There are no activity restrictions.

(*Id.* at 2017.)

Dr. Bradford opined Sparks could: occasionally lift 51-100 pounds and continuously lift up to 50 pounds; continuously carry up to 50 pounds; sit, stand, and walk up to eight hours per day; continuously reach in all directions, handle, finger, feel, push, and pull bilaterally; occasionally operate foot controls with the right (due to plantar fasciitis) and continuously operate foot controls with the left; continuously climb ramps, stairs, ladders, and scaffolds; and continuously balance, stoop, kneel, crouch, and crawl.  (*Id.* at 2009-12.)  Dr. Bradford further opined Sparks did not need a cane to ambulate and had no manipulative, environmental, or postural limitations.  (*Id.* at 2010, 2013.)

On August 18, 2018, again after the hearing and at the request of the ALJ, Sparks underwent a mental assessment with Deborah Koricke, Ph.D.  (*Id.* at 2023.)  Sparks reported difficulties with overly sad and depressed moods, which occurred weekly, sleep disturbance, isolating from others, lack of pleasure in activities, and mood swings.  (*Id.* at 2025.)  Sparks told Dr. Koricke she had periods of elevated energy where she starts projects but does not finish them, acts impulsively, gets agitated and angry easily, and has a harder time getting along with others.  (*Id.*)  She then will "crash again" into a depression.  (*Id.*)  Sparks also reported difficulty being around people, becoming easily stressed and irritable around others.  (*Id.*)

Dr. Koricke observed Sparks walked with a cane and even with it, her gait was unsteady.  (*Id.* at 2026.)  Her hair was slightly disheveled.  (*Id.*)  Sparks winced and demonstrated difficulty moving from sitting to standing.  (*Id.*)  Dr. Koricke noted normal fine motor skills.  (*Id.*)

On examination, Sparks appeared difficult to engage, irritable, and agitated, but she answered Dr. Koricke's questions.  (*Id.*)  Sparks shared information about her life and attempted to cooperate.  (*Id.*)  Dr. Koricke found Sparks demonstrated a blunted affect and poor attention.  (*Id.*)  Dr. Koricke opined Sparks had some difficulty tracking the conversation and had some difficulty understanding some instructions, including complex instructions such as serial sevens.  (*Id.*)  Sparks put forth effort but became easily frustrated.  (*Id.*)

Sparks demonstrated slow and soft speech and a broken and fragment thought process.  (*Id.*)  Sparks lost her train of thought easily and repeated herself time and again.  (*Id.*)  Dr. Koricke noted Sparks' complaints of difficulty with memory and concentration was apparent during the examination.  (*Id.*)  Sparks made only intermittent eye contact and appeared fatigued.  (*Id.*)  Sparks appeared anxious or nervous during the examination, looked down at the floor, and had a limited frustration tolerance and difficulty persisting.  (*Id.* at 2027.)  Sparks demonstrated adequate insight and judgment and had good social judgment.  (*Id.*)

Dr. Koricke opined Sparks would have difficulty remembering and carrying out instructions and would have limitations in attention, concentration, and pace, as well as responding appropriately to supervision and coworkers.  (*Id.* at 2028-29.)

That same day, Dr. Koricke completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) and opined Sparks had the following limitations:

- Mild restrictions in understanding, remembering, and carrying out simple instructions;

- Moderate restrictions in making judgments on simple work-related decisions and understanding and remembering complex instructions;

- Marked restrictions in carrying out complex instructions and making judgments on complex work-related decisions;

- Moderate restrictions in her ability to interact appropriately with the public, supervisors, and co-workers; and

27

- Marked restriction in responding appropriately to usual work situations and changes in a routine work setting.

(*Id.* at 2019-20.)  Dr. Koricke opined these limitations began in 2016.  (*Id.* at 2020.)

**D.     Post-decision Evidence**

Sparks submitted medical records to the Appeals Council in support of her appeal of the ALJ's decision.  (*Id.* at 32-257.)  The Appeals Council declined to exhibit the evidence, as the December 2017 to January 2019 evidence did not show a reasonable probability that it would change the outcome of the decision, and the evidence after January 2019 did not relate to the period at issue since it post-dated the ALJ's decision and did not affect the determination of whether Sparks was disabled on or before January 23, 2019.  (*Id.* at 2.)

**C.     State Agency Reports**

On July 18, 2016, Robert Klinger, M.D., opined Sparks could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour work day, and sit for about six hours in an eight-hour work day.  (*Id.* at 354-55.)  Sparks' ability to push and pull was unlimited, other than shown for lifting and carrying.  (*Id.* at 354.)  Dr. Klinger further opined Sparks could occasionally climb ramps/stairs and never climb ladders, ropes, or scaffolds.  (*Id.*)  Sparks could frequently balance, stoop, kneel, crouch, and crawl.  (*Id.*)

On September 22, 2016, Robert Wysokinski, M.D., affirmed Dr. Klinger's findings on reconsideration, except Dr. Wysokinski determined Sparks could occasionally crawl and must avoid all exposure to hazards.  (*Id.* at 324-27.)

On July 22, 2016, Kathleen Malloy, Ph.D., adopted the ALJ's mental RFC dated March 18, 2015, pursuant to AR 98-4 (Drummond Ruling).  (*Id.* at 352, 356.)   On September 22, 2016, on reconsideration, Jennifer Swain, Psy.D., affirmed the adoption of the March 18, 2015 mental RFC.  (*Id.* at 323.)

## D.   Hearing Testimony

During the January 22, 2018 hearing, Sparks testified to the following:

- She had a current driver's license but did not drive very often.  (*Id.* at 275.)

- She was still having problems concentrating.  (*Id.*)

- Her wrists have been bothering her for over a year.  (*Id.* at 280.)  Nerve tests showed she has carpal tunnel in both hands.  (*Id.*)  She has numbness and tingling in her hands and cannot feel things even though she knows she is touching them.  (*Id.*)  She has a hard time writing, holding things, opening things, and gripping things because her hands bother her.  (*Id.* at 281.)  She has issues doing her hair, lifting her arms, and vacuuming.  (*Id.*)  She can grip doors when she does not have a tingling sensation in her hands.  (*Id.*)  She gets those sensations in her hands every day.  (*Id.*)  Sometimes the sensation is constant, sometimes it comes and goes.  (*Id.* at 282.)  She tries not to use anything with buttons but can use zippers.  (*Id.*)

- Her neck and shoulders hurt, as do her hip bones.  (*Id.* at 283.)  Her back bothers her when she sits for too long and when she stands to wash the dishes.  (*Id.*)  She does not bend up and down.  (*Id.*)  Sometimes it is hard to get up from sitting down, and it is hard to get up out of the tub.  (*Id.*)  She can sit for five to ten minutes before she needs to change position.  (*Id.* at 284.)  She cannot walk very far (maybe halfway to the waiting room) without her walker.  (*Id.*)  She tried to carry milk, but it did not go well.  (*Id.*)  She can only carry something light, like a small box of oatmeal or some bread, in a grocery bag.  (*Id.*)  Her right shoulder bothers her more than her left.  (*Id.* at 285.)  She cannot lift her right arm over her head, and she does not like her bra strap sitting on her right shoulder as it bothers her.  (*Id.*)  She has a hard time even lifting her right arm out in front of her.  (*Id.* at 289.)  She rated her neck pain on an average day as an 8/10.  (*Id.* at 285.)  Her medications do not really help.  (*Id.* at 286.)  Her daughter or mother helps her get dressed.  (*Id.*)  She tries not to move her neck in looking up and down.  (*Id.* at 287.)  Her back pain travels down her hips, her legs, and her thighs.  (*Id.* at 290.)  She wears a back brace, which is a little supportive.  (*Id.*)  If her back pain does not improve, she will need to get injections.  (*Id.*)  She is afraid of needles.  (*Id.*)  She tries putting warm compresses on her back.  (*Id.* at 303.)

- She gets headaches two to three times a week.  (*Id.* at 288.)  Sometimes she needs to have the lights out, and other times it's a "fog headache."  (*Id.*)  Her last headache where she needed to have the lights out was in December.  (*Id.*)  Motrin and Tylenol do not help her headaches.  (*Id.* at 289.)  She normally goes to the emergency room when she gets headaches and gets an IV and other treatment, and then the headaches will be gone for a while.  (*Id.* at 288-89.)

- Her feet hurt and swell a lot.  (*Id.* at 291.)  Sometimes it hurts so much when she steps down on them that she wants to jump off them.  (*Id.*)  She gets injections in her feet, although they do not help at all.  (*Id.* at 291, 302.)  They swell "maybe" once a

week.  (*Id.* at 291.)  They are sore to the touch.  (*Id.* at 291-92.)  It hurts to walk on her feet, so she tries to walk on the sides of her feet, although the doctor told her not to.  (*Id.* at 292.)  She cannot wear shoes every day.  (*Id.*)  Sometimes she just wears socks and flip flops.  (*Id.*)  She elevates her feet above her heart when they swell.  (*Id.*)  Her foot is still healing from her bunion surgery.  (*Id.* at 303.)  It is still a little sore, but her doctor said it would take time to heal.  (*Id.*)

- She is on Lyrica for her fibromyalgia.  (*Id.* at 293.)  Some days she cannot get out of bed.  (*Id.*)  She had two such days last week.  (*Id.*)  On those days, she will lay in bed all day unless she has to use the bathroom.  (*Id.*)  When she wakes up, she is in pain; sometimes it will subside, but then it comes back.  (*Id.*)

- Her knees lock up and give out on her a lot, mainly her right knee.  (*Id.* at 297.)

- Her 17-year old daughter helps her a lot, and sometimes her mother comes over and helps.  (*Id.* at 282-83.)

- She is still having issues with her bipolar disorder.  (*Id.* at 294.)  She will lash out and get upset with people, say things, throw things, and then after she will be fine.  (*Id.*)  She sees a counselor or psychiatrist twice a month or more if necessary.  (*Id.*)  When she is depressed, she isolates herself from everyone and will not do anything.  (*Id.* at 295.)  That happens once or twice a week.  (*Id.*)  Sometimes she cries for no reason, but it does not happen often.  (*Id.*)

- She still has obsessive-compulsive tendencies.  (*Id.* at 303-04.)  She "constantly" checks her doors, locks, and stove.  (*Id.* at 304.)  She has an "issue" with things being straight and must have them diagonal instead.  (*Id.*)  She spends about an hour doing these obsessive-compulsive activities.  (*Id.*)

- She attends school events with her children.  (*Id.* at 296.)  She plays Uno with her children and will be okay so long as she does not get tingling in her hands and cannot hold the cards.  (*Id.* at 296-97.)  She plays video games with her youngest even though her hands get tingling and the controller falls.  (*Id.* at 297.)  Her son will tell her it's okay and he will pick up the controller.  (*Id.*)

- She can read something but then does not remember what she read.  (*Id.* at 297-98.)  She writes herself sticky notes to remember things.  (*Id.* at 298.)  She takes her medication on time; she has the bottles on her dresser and has notes there to remind her when to take them.  (*Id.*)

- The most comfortable position for her is laying down.  (*Id.* at 299.)

- She goes grocery shopping, but she goes to 24-hour stores because she does not like being around a lot of people.  (*Id.*)  They go late at night or early in the morning.  (*Id.* at 300.)  Her older son or her mother takes her shopping; she does not go by herself.  (*Id.* at 301.)

- She does not go to family gatherings with more than ten people.  (*Id.*)

30

- She has been using a rolling walker since last year.  (*Id.*)  She did not have a cane before that, although she has a prescription to get one.  (*Id.* at 302.)

- She does not handle stress well.  (*Id.* at 305.)

- Sometimes she sleeps well, but sometimes she can be up all night and still be awake in the morning.  (*Id.*)  Her sleep medication helps her fall asleep, but do not help her stay asleep.  (*Id.*)

The ALJ noted Sparks wore braces on both wrists and used a rolling walker with a seat on it at the hearing.  (*Id.* at 274.)

The VE testified Sparks had past work as a child monitor, cleaner, hospital, housekeeper, and recreation leader.  (*Id.* at 306-07.)  The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the claimant's age, education, and work experience who is able to perform medium exertional work activities with the following limitations. The individual can occasionally climb ramps and stairs, should never climb ladders, ropes, and scaffolds, occasionally balance, frequently stoop, kneel, crouch, and crawl. The individual can perform simple tasks in a non-public setting with no more than in-frequent changes that are well-explained. The individual can perform goal-oriented work, but not at a production rate pace. The individual can occasionally interact with supervisors and coworkers, but that interaction is limited to speaking and signaling, and no interaction with the public. Can that hypothetical individual perform any past jobs as actually performed or generally performed in the national economy?

(*Id.* at 307-08.)

The VE testified the hypothetical individual would not be able to perform Sparks' past work as a child monitor, cleaner, hospital, housekeeper, or recreation leader.  (*Id.* at 308.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as hand packager, general laborer, and laundry laborer.  (*Id.*)

The ALJ then modified the hypothetical to reflect a hypothetical individual who could perform light work, occasionally crawl, frequently reach in all directions bilaterally, and should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle.  (*Id.* at 309.)  The VE testified past work would still be excluded, but the hypothetical individual could perform other

31

representative jobs in the economy, such as all electronics worker, gluer, and assembler of electrical accessories.  (*Id.*)  The VE testified those jobs would remain if the ALJ changed the hypothetical to reflect the individual could only occasionally stoop, kneel, and crouch.  (*Id.* at 310.)  The ALJ asked the VE whether the representative jobs would change if the hypothetical individual could frequently handle, finger, and feel, as well as frequently use hand controls bilaterally.  (*Id.*)  The VE testified that would eliminate the hand packager job at medium exertion and substituted that job with assembler of metal furniture.  (*Id.*)  The ALJ further modified the hypothetical to limit the hypothetical individual to occasionally handle, finger, and feel, as well as use hand controls bilaterally, which the VE testified would eliminate all work.  (*Id.*)

The ALJ asked the VE what kind of impact a person using a walker would have on the identified jobs.  (*Id.* at 311.)  The VE testified that while that would be an issue for work at the medium level of exertion, "[a]t the light level, the jobs don't require any essential ambulation to perform, so at the light level those jobs would be unaffected . . . ."  (*Id.*)  The ALJ then asked the VE what impact a person needing to elevate their feet above heart level would have on the availability of jobs.  (*Id.*)  The VE testified that without accommodation, there would be no work.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Sparks was insured on her alleged disability onset date, March 18, 2015, and remained insured through December 31, 2017, her date last insured ("DLI.")  (Tr. 16-17.)  Therefore, in order to be entitled to POD and DIB, Sparks must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.  The claimant has not engaged in substantial gainful activity since March 18, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease of the thoracic and cervical spine; lumbar radiculopathy, cericoranial syndrome and scoliosis of spine; Morton neuroma 3rd interspace between both feet; degenerative disc disease bilateral hips; chronic pain syndrome, fibromyalgia; osteoarthritis; obesity, disorder in muscles and ligaments of left foot; bipolar disorder; and depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently reach in all directions bilaterally; occasionally climb ramps or stairs and crawl; never climb ladders, ropes or scaffolds; occasionally balance; frequently stoop, kneel, and crouch; can perform simple tasks in a non-public setting with no more than infrequent changes that are well-explained; can perform goal-oriented work but cannot perform at a production rate pace; can occasionally interact with supervisors and coworkers but that interaction is limited to speaking and signaling; and cannot interact with the public; the individual should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle; the individual would need cane for balance and ambulation.

6.     The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on March **, 1969 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 18, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-24.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).   Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot

36

determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    RFC Challenges

#### 1.    The need for Sparks to elevate her legs

Sparks argues the ALJ committed reversible error in failing to mention the need for her to elevate her legs in the administrative decision "despite the existence of supportive treatment and medical records, Ms. Sparks [sic] testimony that she elevates her legs to above 90 degrees daily (heart level)(Tr.13-31), and that Ms. Sparks has been prescribed a cane and walker to ambulate (Tr.301-02)."  (Doc. No. 16 at 17.)

Respondent argues the ALJ was not required to discuss Sparks' testimony that she needed to elevate her legs during the workday or to include this limitation in the RFC.  (Doc. No. 17 at 10.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§§ 404.1527(d)(2), 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. §§ 404.1546(c), 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v.*

*Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis*); Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that

points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

None of the medical records Sparks cites document a need to elevate her legs.  (Doc. No. 16 at 18.) In addition, Sparks fails to tie the medical records regarding her fibromyalgia, knee pain, and back pain to her feet swelling and her need to elevate them.  (*Id.*)  The ALJ at Step Two found Sparks' bilateral plantar fasciitis, hammertoe, and hallux valgus of the right foot to be impairments that resolved with treatment within twelve months or did not result in any functional limitation while maintaining a prescribed course of treatment (Tr. 19), a finding Sparks does not challenge on judicial review.  (Doc. No. 16.)  Furthermore, the medical records show Sparks got pain relief from the injections in her feet and that her bunionectomy was successful and she had no complaints after healing from surgery.  (Tr. 1901, 1920, 1905, 1909, 1911.)

The only evidence Sparks cites to support her need to elevate her legs is her own testimony.  (Doc. No. 16 at 17.)[3]  First, the ALJ found Sparks' statements regarding the intensity, persistence, and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" (Tr. 21), a finding Sparks does not challenge on judicial review.  (Doc. No. 16.)  But even if the ALJ fully credited Sparks' testimony about her need to elevate her feet above heart level, Sparks' testimony does not establish that she would need to do so during the workday.  Sparks testified her feet swell "maybe once a week."  (Tr. 291.)   Therefore, even Sparks' own testimony fails to establish that the need to elevate her feet should have been incorporated into the RFC. As set forth above, there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 402 (6th Cir. 2008) ("As a general

---

[3] Sparks' brief cites Tr. 13-31 for her testimony that she needs to elevate her legs daily.  (Doc. No. 16 at 17.)  However, those transcript pages are the ALJ's decision, not Sparks' testimony, and Sparks asserts the ALJ's decision fails to address the need for her to elevate her legs.

matter, agencies need not explicitly reject every legal contention for which there is no substantial basis in the record.").

Finally, while it is unclear to the Court what Sparks is arguing in raising Sparks' need for a cane in relation to the need to elevate her feet, the ALJ included a requirement for a cane to walk and balance in the RFC.

For all these reasons, the Court finds the ALJ did not err in omitting mention of Sparks' need to elevate her feet in her decision.

### 2. Whether substantial evidence supports the ALJ's determination that Sparks could perform a light work with additional limitations

Sparks argues the ALJ erred in determining she could perform light work, as the impairments the ALJ found severe demonstrate Sparks "is significantly limited in her ability to sit, stand, walk and grip . . . ." (Doc. No. 16 at 19.) In addition, Sparks challenges the ALJ's "cursory review" of the medical evidence and that the decision "provides no insights into the ALJ's view as to the import of SSR-10 as it applies to the plaintiff (if he considered it at all) . . . ." (*Id.* at 21.) As a result, Sparks asserts the requisite accurate and logical bridge between the evidence and the ALJ's conclusion is missing, and therefore, remand is required. (*Id.* at 22.)

Respondent argues the ALJ "properly found" Sparks could perform a range of light work, and her argument is "just a request for the Court to reweigh the evidence, *see* Br. at 19-22, which is of course improper." (Doc. No. 17 at 12.)

The ALJ's RFC analysis consisted of the following:

> The claimant testified that she is unable to work due to the combined limiting effects of bilateral carpal tunnel syndrome musculoskeletal pain, difficulty with comprehension and difficulty interacting with others. After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this decision.

Elisabeth Ray, M.D., diagnosed the claimant as having fibromyalgia on May 11, 2015 (exh. B5F p.13). At that time, the claimant's complaints of pain "all over", fatigue, difficulties with memory and concentration and lack of physical activity were consistent with the ACR criteria for fibromyalgia. Dr. Ray recommended that the claimant see a neuro pain specialist and recommended chronic pain rehabilitation (exh. B5F p.13,14). The claimant maintains a normal gait and posture and is fully ambulatory (exh. B5F p.24). She continued to complain of pain throughout her joints and muscles in May 2016 that did not improve with medication or physical therapy (exh. B5F p.48). The claimant acknowledged little to no physical activity and stated she did not like to leave her house because it was hard to climb the stairs required for ingress/egress (exh. B5F p.48). Dr. Ray noted that the ability to control the claimant's pain through medication was complicated by psychiatric medications, and continued to encourage the claimant to exercise and attend a chronic pain rehabilitation program (exh. B5F p.51).

The claimant is 154.94 cm tall and weighs 90.72 kg has a body mass index of 37.8, which is considered obese (exh. B5F p.59). In October 2016, the claimant sought emergency treatment from back pain that radiated to her left lower extremity that was diagnosed as pyelonephritis (exh. B18F p.24,36). The claimant continued to have normal range of motion in her back and extremities (exh. B18F p.26). In January 2017, the claimant reported having numbness and tingling in her hands (exh. B18F p.44). She maintained a normal range of motion in her extremities, back and cervical spine despite complaints of pain (exh. Bl 8F pp.46,156). An x-ray of the claimant's cervical spine showed some mild degenerative changes (exh. Bl8F pp.46,50). The consultative examination report of Dorothy Bradford, M.D., supports the claimant's allegations that she requires a cane for balance and ambulation, but otherwise notes that the claimant maintains full strength, sensation and range of motion in her extremities despite limitations in her spine (exh. B25F).

Treatment records from the Cleveland Clinic foundation dated April 7, 2015, just after the claimant's alleged onset date, confirm that the claimant felt depressed and struggled with motivation (exh. B5F p.8). In October 2015, the claimant required emergency treatment for an altered mental status from which she recovered spontaneously (exh. B5F p.22). In October, 2016, the claimant had normal mood and affect despite complaints of pain (exh. Bl8F p.26). Treatment records from Murtis Taylor indicate that the claimant received a diagnosis of bipolar II disorder with recurrent major depressive disorders, and that she has continued to work to stabilize her moods with medication (exh. Bl9F p.9).

As for the opinion evidence, the undersigned accords no weight to the State agency psychological consultants' opinions are accorded no weight because the

consultant adopted the prior administrative law judge's findings under *Drummond*. As previously stated, *Drummond* does not apply with respect to the claimant's mental impairments due to a change in law and regulation.

The undersigned finds partial weight should be accorded to the State agency medical consultant's opinions (exhs. B2A and B4A) as the undersigned finds claimant could only occasionally crawl due to her hip and back issues as well as obesity. The claimant can occasionally balance due to her back, hip, and foot issues as well as obesity. In addition, the claimant should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle due to her back, hip, and foot issues as well as obesity. The claimant would need a cane for balance and ambulation due to her back, hip, and foot issues as well as obesity. These additional limitations were added to coincide with the medical records.

The undersigned accords partial weight to Dr. Bradford's opinion that the claimant could perform work activities consistent with the medium level of exertion and could ambulate without a cane (exh. B25F p.11). This assessment conflicts with Dr. Bradford's own observations that the claimant moves slowly, and experiences joint pain and stiffness (exh. B25F p.13).

The undersigned accords significant weight to the consultative opinion of Dr. Koricke that the claimant would have marked limitations with respect to complex tasks and work related decisions and responding appropriately to changes in a routine work setting (exh. B26F). Dr. Koricke's assessment is consistent with her observations of the claimant's ability to complete tasks, respond to questions, and maintain conversation, and the claimant's statements regarding fluctuating mood and affect (exh. B27F). The undersigned finds the opinion that the claimant could understand simple questions and instructions, but is limited in her ability to interact with others and respond appropriately to stress and pressure (exh. B27F p.7).

In sum, the above residual functional capacity assessment is supported by treatment records that demonstrate although the claimant has difficulty with complex tasks and struggles to interact with others, she is able to simple tasks that do not involve interact with the public and no more than occasional interaction with supervisors and co-workers. Although the claimant has routinely complained of diffuse body pain and fatigue, she has had limited follow-up with prescribed therapies such as aquatic therapy, daily exercise and neuro pain clinics.

(Tr. 21-23.)

While the Court agrees the ALJ's review of the medical evidence in the record was brief, the Court

disagrees that the decision, when read as a whole, fails to build the requisite accurate and logical bridge

between the evidence and the ALJ's conclusion that Sparks could perform a range of light work while using a cane to walk and balance.

As Respondent notes, two doctors opined Sparks could perform light work, and consultative examiner Dr. Bradford, who examined Sparks in August 2018, opined Sparks could perform medium work.  (Tr. 324-27, 340-43, 353-55, 365-67, 2009-14..)  The ALJ assigned partial weight to each of these three opinions, finding more restrictions in Sparks' favor than the doctors themselves.  (*Id.* at 22.)  Sparks fails to challenge the weight assigned to any of the medical opinions on judicial review.

As the ALJ determined, the record reflects many instances of Sparks' failure to follow up with prescribed therapies, including physical therapy, aquatic therapy, and home exercise programs, as well as referrals to the neuro pain clinic and other doctors.  Under SSR 16-3p, the ALJ may consider a claimant's non-compliance with treatment as part of the ALJ's subjective symptom analysis.  2017 WL 5180304, at *9 (Oct. 25, 2017).  As noted above, Sparks does not challenge the ALJ's subjective symptom evaluation.

Furthermore, to the extent Sparks argues an RFC finding of a range of light work is inconsistent with cane usage, this Court and other courts have rejected such an argument.  *Bonette v. Comm'r of Soc. Sec.*, No. 3:16 CV 252, 2017 WL 9476853, at *13 (N.D. Ohio Feb. 2, 2017) (collecting cases).  In addition, the VE testified the light level jobs identified at the hearing would be not be impacted using a walker.  (Tr. 311.)  In the interrogatories proffered after the hearing, the VE identified three jobs an individual could perform using a cane to walk and balance and opined the jobs could be performed sitting or standing.  (*Id.* at 577-79.)

The evidence regarding Sparks' limitations is mixed, and it is not for the Court to reweigh the evidence.  While the Court acknowledges there is evidence in the record that supports Sparks' argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.

43

Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts."  *Felisky*, 35 F.3d at 1035.  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of Soc. Sec.*, No. 16-13645, 2018 WL 1477128, at *10 (E.D. Mich. Mar. 1, 2018), *report and recommendation adopted by* 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018).  Here, the ALJ's RFC findings that Sparks could perform a range of light work are within that "zone of choice" and thus supported by substantial evidence.

**B.      Sentence Six Remand**

Sparks argues she is entitled to a Sentence Six remand for consideration of medical evidence from December 2017 through April 2019 submitted to the Appeals Council in her request for review of the ALJ's decision.  The entirety of the substance of Sparks' argument, after a summary of the additional medical evidence and the legal standards, is as follows:

> This evidence is new as it was either unavailable at the time of the January 22, 2018 hearing or clearly not in existence at the time of the hearing.  These records are highly material, even though they document a time period past the hearing date, as they relate back to the relevant time period.

(Doc. No. 16 at 23.)

Respondent argues that Sparks' Sentence Six argument is "undeveloped and waived."  (Doc. No. 17 at 15.)  In addition, Respondent argues that Sparks fails to show the evidence is new and material, and that she had good cause for failing to present this evidence to the ALJ.  (*Id.* at 16.)

The Court agrees with the Commissioner that Sparks waived this argument by failing to develop it.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (citations omitted).  It is not for this Court to develop Sparks' arguments for her.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date:  January 5, 2021                                   *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge